the testimonial statement that damns him comes from the mouth of a child or an adult—the Sixth Amendment guarantees him the right to confront his accuser. In this case, the State presented N.M.'s out-of-court testimonial statements as evidence against defendant, without giving defendant the opportunity to cross-examine him. The introduction of those statements contravened the Confrontation Clause. The result the majority reaches today, in its haste to uphold defendant's conviction, is driven by a distorted analysis of the precedents of the United States Supreme Court and this Court.

*For Dissent*—Justices LONG, ALBIN and WALLACE—3.

949 A.2d 790

STATE OF NEW JERSEY IN THE INTEREST OF J.A., JUVENILE–APPELLANT.

Argued February 5, 2008—Decided June 23, 2008.

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Christopher W. Hsieh,* Senior Assistant Prosecutor, argued the cause for respondent State of New Jersey (*James F. Avigliano,* Passaic County Prosecutor, attorney).

*Alison S. Perrone* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey.

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

Justice ALBIN delivered the opinion of the Court.

In *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), the United States Supreme Court dramatically altered the landscape of its Confrontation Clause jurisprudence, rendering unconstitutional the admission of an out-of-court "testimonial" statement permitted by state hearsay rules, *unless* the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine that person. In returning to the Framers' original understanding of the Confrontation Clause, the Court barred the use of testimonial statements, taken in the course of police questioning and unchallenged by cross-examination, as a substitute for in-court testimony. *Id.* at 50–52, 124 *S.Ct.* at 1363–64, 158 *L.Ed.*2d at 192–93.

In *Davis v. Washington,* 547 *U.S.* 813, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006), the Supreme Court made clear that not all statements elicited by law enforcement will be deemed testimonial.

Thus, nontestimonial statements are those "objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," and testimonial statements are those "objectively indicat[ing] that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237.

In this juvenile delinquency case, we must determine whether statements made by a non-testifying witness to a police officer, describing a robbery committed ten minutes earlier and his pursuit of the robbers, were admitted in violation of our state hearsay rules and the Sixth Amendment's Confrontation Clause. The statements were a narrative of past events and made while neither the declarant nor victim was in imminent danger. In light of *Crawford* and *Davis*, we now hold that those hearsay statements were testimonial. Because the declarant was not produced as a witness or ever subject to cross-examination, the admission of those statements violated the juvenile's Sixth Amendment right to confront the witnesses against him.

I.

A.

J.A. was charged in a complaint with an act of juvenile delinquency, which if committed by an adult would constitute a second-degree robbery under *N.J.S.A.* 2C:15–1. These are the facts presented at trial before a Family Part judge.

On February 10, 2005, at approximately 9:30 p.m., Juana Chavez, a fifty-two-year-old cable worker and part-time student, had completed class and was walking to her home in Paterson. While on 31st Street heading toward 20th Avenue, fourteen-year-old H.A. grabbed Chavez's shoulder from behind and attempted to wrest her purse from her. She resisted, clinging to her purse, and was thrown to the ground. With Chavez lying prone, half on

the street and half on the sidewalk, her knees bleeding and her books scattered about, H.A. then pulled the purse free from her shoulder and ran off. As H.A. fled, Chavez noticed that another individual was running alongside him. Whereas Chavez was able to see H.A.'s face and identify his clothing—a black jacket over a red-hooded sweater—she was only able to describe the other individual as wearing black clothing. She did not see the second individual's face.

After Chavez picked herself up, she walked a short distance to the corner of 31st Street and 20th Avenue where three girls came to her assistance, one offering her cell phone so that Chavez could call the police. Because of the difficulty she has speaking English, Chavez decided to call her son, who told her to wait at that location until he arrived. Within ten minutes, however, the girls waved down a police officer and explained to him that Chavez had been the victim of a robbery. Chavez gave Officer Frank Belton a description of the person who pushed her to the ground and took her purse.

Meanwhile, at 9:31 p.m., while on patrol, Officer Frank Semmel received a dispatch from headquarters to respond to the area of 20th Avenue and East 31st Street. On arriving at the scene, Officer Semmel observed that a police unit was already tending to the robbery victim. He then began patrolling the area in search of the perpetrator(s). Another dispatch received by Officer Semmel gave a description of one suspect and advised that "a witness to the crime" was following two suspects. Within approximately two minutes of receiving that last dispatch, Officer Semmel arrived at Public School 30, "[a]bout a block and a half to two blocks" from the robbery scene,[1] where he found the witness. The witness stepped out of his car and spoke to the officer.

---

[1] Officer Semmel testified that the school was located as "20th and East 21." However, the Paterson School District's website lists Public School 30 at being located at 851 E. 28th St., three blocks from the robbery scene. *http://www. paterson.k12.nj.us/schools.html* (last visited Apr. 28, 2008).

At trial, over J.A.'s objection, the court permitted Officer Semmel to testify to the witness's account as a present sense impression, an exception to the hearsay rule, *N.J.R.E.* 803(c)(1).[2]  The witness told Officer Semmel that he had observed two teenage Hispanic males "just" rob a woman on 31st Street and East 20th Avenue and that they were "walking down East 25th towards 21st Ave."  The witness further stated that he had "followed the suspects" as far as the school.  He described one of the suspects as "wearing a white and blue jacket" and the other a "red jacket and glasses."[3]

Over his police radio, Officer Semmel transmitted the direction in which the suspects were last seen walking and resumed his patrol.  Halfway between 20th and 21st Avenues, Officer Semmel and another Paterson police officer stopped two Hispanic fourteen-year-olds who were wearing the clothing described by the witness.  H.A. and J.A. were detained as "possible suspects in a robbery," handcuffed, placed in the back of Officer Semmel's patrol car, and brought to the robbery scene, where Chavez was waiting.[4]  Chavez identified H.A. as the person who knocked her down and stole her purse.  She could not identify J.A. as the person accompanying H.A. in his flight from the scene.  J.A. was wearing a red jacket and glasses whereas the person who Chavez saw fleeing with H.A. was dressed in black.  Both juveniles were arrested.

Officer Semmel then read H.A. his *Miranda*[5] rights and questioned him.  H.A. led Officer Semmel to the location of Chavez's

---

[2] The court rejected, without elaboration, the excited utterance exception as a justification for the admission of the witness's out-of-court statements.

[3] The State explained that the witness refused to come to court, despite its efforts to obtain his appearance.  The State did not assert that a subpoena had been issued to the witness.

[4] In contrast to Officer Semmel's testimony, Officer Belton testified that the suspects arrived at the scene in separate patrol units.

[5] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

purse at the rear of School 30. The purse's contents were spilled on the ground, but no money was found in or about the purse.

Chavez testified that, at the time of the robbery, "she didn't even have $20" on her. Officer Semmel, however, recalled that Chavez told him that she had eighteen dollars in her purse. His search of H.A., he stated, uncovered twelve dollars. In contrast, Officer Belton testified that he searched both H.A. and J.A., finding on H.A. six dollars and on J.A. twelve dollars. The money found on the two suspects was put into Chavez's purse before it was returned to her.

J.A. did not testify or call any witnesses in his defense.

Relying in large part on the statements made by the non-testifying eyewitness, the family court judge, sitting as the trier of fact, found J.A. guilty of second-degree robbery as an accomplice to H.A. and therefore entered an adjudication of delinquency. J.A. was committed to a two-year term at the State Home for Boys.[6]

## B.

The Appellate Division affirmed J.A.'s adjudication of delinquency, finding that the family court properly admitted the non-appearing eyewitness's out-of-court statements through Officer Semmel's testimony. *State ex rel. J.A.*, 385 *N.J.Super.* 544, 550, 897 *A.*2d 1119 (App.Div.2006). The appellate panel first determined that the eyewitness's statements were admissible under the present sense impression and excited utterance exceptions to the hearsay rule, *N.J.R.E.* 803(c)(1) and (2). *J.A., supra*, 385 *N.J.Super.* at 554, 897 *A.*2d 1119. The panel reached that conclusion

---

[6] Immediately before the commencement of J.A.'s trial, H.A.—who also had been charged with a juvenile offense, which if committed by an adult would constitute a second-degree robbery—pled guilty to the downgraded offense of third-degree theft from a person, *N.J.S.A.* 2C:20–3. Based on H.A.'s admitted act of delinquency, the judge imposed a twenty-month probationary period and fifty hours of community service.

because the eyewitness had observed "a startling event"—a robbery—and reacted "spontaneous[ly] and coincident[ly] with the occurrence, leaving no pause for premeditation." *Id.* at 553, 897 A.2d 1119. The panel noted that the witness followed the assailants for several blocks over a period of minutes during which he called the police, and that when he encountered Officer Semmel, he related details of the robbery, including a description of the individuals he had been pursuing. *Id.* at 553–54, 897 A.2d 1119. The brief period between the witness's observations and his recounting of the events to Officer Semmel, during which the witness was in a continuing "excited state," led the panel to believe that the out-of-court statements fell within the present sense and excited utterance exceptions to the hearsay rule. *Id.* at 554, 897 A.2d 1119.

The panel also held that the introduction of those hearsay statements did not violate J.A.'s Sixth Amendment right to confront the witnesses against him. *Id.* at 558, 897 A.2d 1119. In deciding that issue, the panel looked to *Crawford,* which held that the Sixth Amendment's Confrontation Clause prohibited the use of out-of-court *testimonial* statements against a criminal defendant unless the defendant had a prior opportunity to cross-examine the person who made the statement and that person is unavailable as a witness. *Id.* at 554, 897 A.2d 1119.

Applying a totality of the circumstances approach, the panel found that the witness's statements in the case were nontestimonial because an "objective witness" would not have reasonably believed that those statements "would be available for use in a later trial." *Id.* at 557–58, 897 A.2d 1119. In coming to that conclusion, the panel reasoned that the eyewitness's statements to the police were "brief, spontaneous, [and] volunteered," and that his statements were not given "in response to 'structured police questioning'" or with "the intent that [they] be 'preserved' for future use in a criminal prosecution against [J.A.]." *Id.* at 558, 897 A.2d 1119. The panel characterized the eyewitness's statements simply as a "report of a crime, rendered to assist law

enforcement in the apprehension of a suspect and the protection of the public." *Ibid.* In short, the panel saw nothing in "the manner or mode" in which the eyewitness made his statements that would qualify them as "the functional equivalent of testimony." *Ibid.* Based on that analysis, the panel determined that the eyewitness's statements were admissible at trial. *Ibid.*[7]

We granted J.A.'s petition for certification. 191 *N.J.* 317, 923 *A.*2d 231 (2007). We also granted the motions of the Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.

## II.

J.A. submits that the non-testifying eyewitness's statements to the police, purportedly describing J.A.'s involvement in the robbery of Juana Chavez, were inadmissible hearsay introduced in violation of our evidence rules and the principles enunciated in *Crawford* and *Davis*. First, J.A. asserts that the non-appearing eyewitness did not speak to Officer Semmel until fifteen to twenty minutes after observing the robbery. Because of the lack of contemporaneity between the witness's observations and his recounting of the events, J.A. argues that the present sense impression exception to the hearsay rule does not apply. He also maintains that because the trial record contains no evidence that the witness, as he spoke to Officer Semmel, was "under the stress of excitement caused" by what he had seen earlier, the excited utterance exception to the hearsay rule is not applicable. Additionally, J.A. contends that the State did not satisfy a requirement under both hearsay rule exceptions—a showing that the witness did not have the "opportunity to deliberate or fabricate."

Concerning his Confrontation Clause claim, J.A. submits that the absent eyewitness's statements to Officer Semmel were "testi-

---

[7] The Appellate Division rendered its decision one month before the release of *Davis*, which addressed in greater detail the defining characteristics of a testimonial statement under *Crawford*.

monial" in nature, intended for the purpose of allowing the police both to apprehend and prosecute Chavez's assailants, and thus inadmissible under *Crawford* and *Davis* because the witness was never subject to cross-examination. According to J.A., the witness gave a narrative of past events to the police that included a description of the assailants—an analog to trial testimony—the very type of hearsay *Crawford* intended to interdict. J.A. acknowledges that under *Crawford* and *Davis* a witness's statements cannot be characterized as testimonial if they were made contemporaneously with an ongoing emergency for the purpose of rendering immediate aid to the victim. He claims, however, that neither the victim nor the witness was in danger when the witness spoke to Officer Semmel.

The ACDL submits that the "core significance of *Crawford*" is that the Confrontation Clause forbids the prosecution from using a non-testifying witness's statement to law enforcement officers about a completed crime—untested by cross-examination—to convict a defendant. The ACDL posits that once a crime is completed, an emergency can no longer be ongoing, and therefore a statement concerning a completed crime must be testimonial. Based on that premise, the ACDL would classify a statement made to a law enforcement officer responding to a crime scene as testimonial, "unless there is an ongoing emergency and the statement is limited to the resolution of that emergency."

On the other hand, the State contends that the Appellate Division properly characterized the witness's statements as present sense impressions and excited utterances because the witness related to a police officer a "startling episode"—a robbery and its perpetrators' flight—"immediately after" observing the events and without time to deliberate or fabricate. Moreover, because "[t]he exclusive purpose of the witness's brief, spontaneous communications was to assist the police with the emergency, not to provide a narrative of the crime," the State argues that the statements were nontestimonial and therefore in compliance with the United States Supreme Court's recent Confrontation Clause jurisprudence. The

State urges this Court to find, consistent with *Crawford* and *Davis*, that an ongoing emergency justifies the admission of hearsay whenever "potentially violent perpetrators remain geographically and temporally connected to the scene," regardless of whether "the victim is no longer in danger."

Consonant with that viewpoint, the New Jersey Attorney General states that admissible, nontestimonial hearsay includes information provided to the police for the purpose of apprehending violent offenders who are in flight from the commission of a crime. Thus, in this case, without contravening the Confrontation Clause, the non-testifying witness imparted "crucial information" necessary to resolve an ongoing emergency—the prompt capture of two fleeing suspects. The Attorney General would not limit an " 'ongoing emergency' . . . to the rendering of immediate aid to a crime victim."

In deciding whether the family court correctly admitted the non-testifying witness's statements to Officer Semmel, we first address whether those statements fall within either the present sense impression or excited utterance exceptions to the hearsay rule and, then, whether those statements were nontestimonial under *Crawford* and *Davis* and pass muster under the Confrontation Clause.

### III.

### A.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.' " *State v. Branch,* 182 *N.J.* 338, 357, 865 *A.*2d 673 (2005) (quoting *N.J.R.E.* 801(c)). Hearsay is inadmissible unless it falls within one or more of the exceptions enumerated in our evidence rules. *Ibid.* Both the trial court and Appellate Division found that the witness's statements to Officer Semmel satisfied the present sense impression exception to the hearsay rule, *N.J.R.E.* 803(c)(1). That exception provides for the

admissibility of "[a] statement of observation, description or explanation of an event or condition made while or immediately after the declarant was perceiving the event or condition and without opportunity to deliberate or fabricate," *N.J.R.E.* 803(c)(1), notwithstanding that the declarant might have been available to testify at trial, *N.J.R.E.* 803(c).

Although the witness called police headquarters and, presumably, was relating to the dispatcher events as they were unfolding, the dispatcher was not called as a witness. Such statements made to the dispatcher would have fit within the classic definition of a present sense impression. The witness's account to Officer Semmel, however, was given minutes after the witness cut short his chase of the juvenile suspects, and approximately ten minutes after the robbery. Thus, the statements to Officer Semmel were not "made while ... the declarant was perceiving the event." *N.J.R.E.* 803(c)(1).

■ The only true issue is whether the statements were made "immediately after" the witness perceived the events—particularly the robbery. *Ibid.* It is the witness's identification of J.A. as one of Chavez's robbers that was key to the prosecution's case— without that critical fact, the witness would have been following two random individuals through the streets of Paterson.

No reported New Jersey case has interpreted the meaning of "immediately after" as contained in *N.J.R.E.* 803(c)(1). That language was added to the current rule in 1991 when our evidence rules were renumbered to conform to the formatting of the federal rules.[8] Biunno, *Current N.J. Rules of Evidence,* comment on *N.J.R.E.* 803(c)(1). Not surprisingly, J.A. and the State construe the words "immediately after" in entirely different ways. J.A. contends that those words suggest a very brief temporal period, whereas the State gives the words more elasticity, so that the

---

[8] *Fed.R.Evid.* 803(1) provides that a present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

witness's uninterrupted pursuit of the suspects would render the absent witness's statements admissible even if made two or ten minutes later.

■ We interpret an evidence rule, as we would a statute, by first looking at its plain language. *See United States v. Am. Tel. & Tel. Co.*, 498 *F.Supp.* 353, 356–58 (D.D.C.1980) (using plain meaning of federal rule in making evidentiary ruling); *see also State v. Brown*, 170 *N.J.* 138, 177–80, 784 *A.2d* 1244 (2001) (Stein, J., dissenting). The word "immediately" is defined as "without lapse of time; without delay; instantly; at once." *Webster's Unabridged Dictionary of the English Language* 957 (2001); *see also Webster's Ninth New Collegiate Dictionary* 601 (1989) (defining "immediately" as "without interval of time"). The dictionary definition suggests a very brief time between the observation and the statement. That commonsense approach is supported by scholarly commentary and case law.

Clearly, "in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse [in time] is allowable." *Fed.R.Evid.* 803(c) advisory committee's note. That simple explanation undoubtedly was the rationale behind the 1991 amendment to *N.J.R.E.* 803(c)(1). In discussing the import of the words "immediately thereafter" as they appear in *Fed.R.Evid.* 803(1), the authors of a treatise on evidence explain:

> The phrase "immediately thereafter" accommodates the human realities that the condition or event may happen so fast that the words do not quite keep pace, and proving a true match of words and events may be impossible for ordinary witnesses, so it would be foolish to require a statement to be truly simultaneous with the event or condition. The exception allows enough flexibility to reach statements made a moment after the fact, where a small delay or "slight lapse" . . . is not enough to allow reflection, which would raise doubts about trustworthiness.
>
> More significant delays—those measured in minutes or hours . . . bar resort to [*Fed.R.Evid.*] 803(1) because they do permit time for reflection and lessen or remove the assurance of trustworthiness.
>
> [4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 434, at 384–86 (2d ed.1994), *quoted in Moe v. State*, 123 *P.3d* 148, 152 (Wyo.2005), *cert. denied*, 547 *U.S.* 1046, 126 *S.Ct.* 1633, 164 *L.Ed.2d* 345 (2006).]

Case law from other jurisdictions suggests that a delay measured in minutes will take a statement outside of the present sense impression hearsay exception. *See, e.g., United States v. Manfre,* 368 *F.*3d 832, 840 (8th Cir.2004) (noting that declarant's "intervening walk or drive" between observing event and making statement negated finding of present sense impression); *United States v. Cain,* 587 *F.*2d 678, 681 (5th Cir.) (finding that witness's out-of-court statement, likely made minutes after observation, did not qualify as "immediately thereafter"), *cert. denied,* 440 *U.S.* 975, 99 *S.Ct.* 1543, 59 *L.Ed.*2d 793 (1979); *Hilyer v. Howat Concrete Co.,* 578 *F.*2d 422, 425–26, 426 n. 7 (D.C.Cir.1978) (holding that witness's statement to officer fifteen minutes after accident "hardly qualifies as 'immediately' after the accident"); *Young v. Commonwealth,* 50 *S.W.*3d 148, 165–66 (Ky.2001) (concluding that statement to officer seven minutes after observing shooting was not "immediately thereafter"). *But see United States v. Blakey,* 607 *F.*2d 779, 785–86 (7th Cir.1979) (determining that tape-recorded telephone statement made by witness "between several and 23 minutes" after event qualified as present sense impression); *Miller v. Crown Amusements, Inc.,* 821 *F.Supp.* 703, 706–07 (S.D.Ga. 1993) (finding that declarant's statements within ten minutes of accident were present sense impressions); *State v. Odom,* 316 *N.C.* 306, 341 *S.E.*2d 332, 335–36 (1986) (holding that witness's statement to officer ten minutes after observing abduction was present sense impression).

When considering whether a statement is a present sense impression, it is not hairsplitting to recognize a distinction between a matter of seconds, however many they may be, and an interval of as much as ten minutes separating a recollection from the observation. For purposes of a *present* sense impression, a declarant's statement that "the blue sports car is going through the red light" or that "the blue sports car just went through the red light" (seconds ago) is different from a declarant's statement that "the blue sports car went through the red light ten minutes ago."

We conclude that the non-appearing witness's statements relating the details of a robbery that occurred ten minutes earlier is not the equivalent of describing the crime "immediately after" it occurred. We therefore hold that the family court abused its discretion by admitting the witness's statements under the present sense impression exception to the hearsay rule. *See Brown, supra,* 170 *N.J.* at 147, 784 *A.*2d 1244 (noting that trial court's evidentiary rulings are reviewed under abuse of discretion standard).

We recognize, however, that a statement inadmissible as a present sense impression may qualify as an excited utterance.

## B.

*N.J.R.E.* 803(c)(2) defines an excited utterance as 1) "[a] statement relating to a startling event or condition"; 2) "made while the declarant was under the stress of excitement caused by the event or condition"; and 3) "without opportunity to deliberate or fabricate." *See Branch, supra,* 182 *N.J.* at 365, 865 *A.*2d 673. Contrary to the family court's ruling, the Appellate Division determined that the excited utterance exception provided an independent basis for the admissibility of the witness's statements to Officer Semmel. *J.A., supra,* 385 *N.J.Super.* at 550–54, 897 *A.*2d 1119. Significantly, the family court did not analyze the witness's statements against the standard set forth in *N.J.R.E.* 803(c)(2), perhaps because those statements were admitted under the present sense impression exception.

We agree with the Appellate Division that the robbery of a woman who is knocked to the ground and whose purse is wrested from her as she cries out is clearly a "startling event" under *N.J.R.E.* 803(c)(2), and that the witness's statement related to that event. *See J.A., supra,* 385 *N.J.Super.* at 553–54, 897 *A.*2d 1119. We also find support for the Appellate Division's conclusion that the witness, who followed the attackers for a number of blocks until he cut short his pursuit, and who for a few minutes waited for the police in a school parking lot, made his statement to

Officer Semmel, presumably, without having had the "opportunity to deliberate or fabricate." *See ibid.* The present facts stand in contrast to those in *Branch, supra,* in which a seven-year-old's statements to an investigating detective, describing a burglary suspect, were held inadmissible as excited utterances because the burglary had occurred twenty minutes earlier and because she had already discussed the incident with her mother and another officer. 182 *N.J.* at 365–66, 865 *A.*2d 673.

Because Officer Semmel did not testify to the witness's appearance or condition, such as whether he was in an anxious or calm state when relating the events, the question of whether "the declarant was under the stress of excitement caused by" the robbery and pursuit, *N.J.R.E.* 803(c)(2), is more difficult to answer. The Appellate Division found that it was "clear[ ]" that "the declarant's excited state was continuing." *J.A., supra,* 385 *N.J.Super.* at 554, 897 *A.*2d 1119. Perhaps, in the circumstances of this case, one can assume that it would have been natural for the witness, or any reasonable person, to be in an excited state after observing a robbery and pursuing the robbers. Nonetheless, facts should have been elicited on the record to support such a finding. Although the witness's statements might be admissible as excited utterances, we have no doubt that the admission of those statements ran afoul of the Confrontation Clause.[9]

## IV.

### A.

■ The Sixth Amendment provides that in a criminal prosecution, the accused has the right "to be confronted with the wit-

---

[9] Our dissenting colleague would have us decide the evidentiary issue despite the inadequate factual record. We decline to do so. In contrast, we have an ample record to decide the constitutional issue before us, which will conclusively dispose of this appeal. *See Resnick v. E. Brunswick Twp. Bd. of Educ.,* 77 *N.J.* 88, 95 n. 4, 389 *A.*2d 944 (1978). The interests of justice and judicial economy command this approach. *See ibid.; cf. Busik v. Levine,* 63 *N.J.* 351, 363–64, 307 *A.*2d 571 (1973) (citing cases in which this Court decided important constitutional issues even when litigation had become moot).

nesses against him." *U.S. Const.* amend. VI. That right embodied in the Confrontation Clause expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination. It has long been held that cross-examination is the " 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green,* 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.*2d 489, 497 (1970) (quoting 5 *Wigmore on Evidence* § 1367).

In *Crawford,* the United States Supreme Court caused a seismic shift in modern Confrontation Clause jurisprudence by interpreting the Clause in light of its historical roots rather than the recent trend to allow the introduction of types of hearsay that would have been forbidden in the early days of the Republic. "[T]he principal evil at which the Confrontation Clause was directed," the Court reminds us, "was the . . . use of *ex parte* examinations as evidence against the accused." *Crawford, supra,* 541 *U.S.* at 50, 124 *S.Ct.* at 1363, 158 *L.Ed.*2d at 192. The abusive use of depositions and other out-of-court statements to prosecute Stamp Act violations in English admiralty courts before the Revolution was within the living memory of those who framed the Clause. *Id.* at 47–48, 124 *S.Ct.* at 1362, 158 *L.Ed.*2d at 190.

Although the Sixth Amendment does not interdict all hearsay, it does prohibit the use of out-of-court *testimonial* hearsay, untested by cross-examination, as a substitute for in-court testimony. "[W]itnesses against the accused," for Confrontation Clause purposes, are "those who bear testimony." *Id.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192 (quotations omitted). In the constitutional sense, testimony is when "[a]n accuser . . . makes a formal statement to government officers." *Ibid.* Out-of-court testimonial statements include affidavits, depositions, grand jury testimony, and "[s]tatements taken by police officers in the course of interrogations"—statements which, given the manner of their use in court, are the functional equivalent of testimony, but which have not been subjected to cross-examination. *Id.* at 51–52, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 193. The Confrontation Clause's

ultimate goal, the Crawford Court explained, is to establish the reliability of evidence "by testing [it] in the crucible of cross-examination." *Id.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199.

Thus, the Sixth Amendment requires that the admission of testimonial hearsay evidence be conditioned on the "unavailability [of the witness] and a prior opportunity for cross-examination" of that witness. *Id.* at 68, 124 *S.Ct.* at 1374, 158 *L.Ed.*2d at 203. The strictures of *Crawford,* however, do not apply to nontestimonial hearsay, which continues to be governed by each state's hearsay law. The logic of *Crawford* compelled the Supreme Court to overturn *Ohio v. Roberts,* 448 *U.S.* 56, 100 *S.Ct.* 2531, 65 *L.Ed.*2d 597 (1980), insofar as it held that in a criminal prosecution an unavailable witness's testimonial hearsay statement was admissible if it fell "within a 'firmly rooted hearsay exception' or b[ore] 'particularized guarantees of trustworthiness,'" *Crawford, supra,* 541 *U.S.* at 42, 124 *S.Ct.* at 1359, 158 *L.Ed.*2d at 187 (quoting *Roberts, supra,* 448 *U.S.* at 66, 100 *S.Ct.* at 2539, 65 *L.Ed.*2d at 608). *See id.* at 60–68, 124 *S.Ct.* at 1369–74, 158 *L.Ed.*2d at 198–203 (criticizing *Roberts* ).

In *Crawford,* the prosecution admitted at trial a statement incriminating the defendant elicited from his wife during a police interrogation concerning his alleged assault of another man. *Id.* at 38–40, 124 *S.Ct.* at 1356–58, 158 *L.Ed.*2d at 184–85. The defendant never had the opportunity to cross-examine her. *Ibid.* The wife's statement to the police was testimonial because it was "a solemn declaration" to a law enforcement officer "for the purpose of establishing or proving some fact." *Id.* at 51, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192 (quotation omitted). The admission of that hearsay statement therefore violated the Confrontation Clause. Although, as noted earlier, the Supreme Court declared that testimonial evidence includes statements derived from police interrogation, it left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* at 68, 124 *S.Ct.* at 1374, 158 *L.Ed.*2d at 203.

Two years later that day came when, in the companion cases of *Davis v. Washington* and *Hammon v. Indiana*,[10] the U.S. Supreme Court more clearly defined the circumstances that give rise to testimonial and nontestimonial statements. Both cases involved police responses to domestic violence calls.

In *Davis, supra*, during the course of a 911 call, a woman told the dispatcher that she was being beaten by her husband and then, a short while later, that he was fleeing from her house. 547 *U.S.* at 817–18, 126 *S.Ct.* at 2270–71, 165 *L.Ed.*2d at 234–35. The woman gave the dispatcher sufficient information to identify her husband. *See ibid.* Within four minutes, police responded to the woman's house and found her with injuries to her forearm and face and in a shaken state. *Ibid.* At her husband's criminal trial, the prosecution played a portion of the 911 conversation without calling the victim as a witness. *Id.* at 818–19, 126 *S.Ct.* at 2271, 165 *L.Ed.*2d at 234–35. The husband was convicted of violating a domestic no-contact order. *Ibid.*

In *Hammon*, police officers responded to a report of a domestic disturbance at a home. *Id.* at 819, 126 *S.Ct.* at 2272, 165 *L.Ed.*2d at 235. They found a woman on the porch in a "somewhat frightened" state and a broken heating furnace emitting flames inside the home. *Ibid.* The police ensured that the woman remained separated from her husband, who was in the kitchen. *Id.* at 819–20, 126 *S.Ct.* at 2272, 165 *L.Ed.*2d at 235. At the scene, both orally and in a handwritten affidavit, the woman described how her husband had assaulted her and her daughter and vandalized her house and van. *Id.* at 819–21, 126 *S.Ct.* at 2272–73, 165 *L.Ed.*2d at 236. At her husband's trial, the oral statements to the police were admitted as excited utterances and the affidavit as a present sense impression. *Id.* at 820, 126 *S.Ct.* at 2272, 165 *L.Ed.*2d at 236. The woman was subpoenaed but did not appear

---

[10] The U.S. Supreme Court consolidated those cases. They are cited together as *Davis v. Washington*, 547 *U.S.* 813, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006). For ease of description, however, when referring to the specific facts in *Hammon v. Indiana*, we will use the short form, *Hammon*.

at trial. *Ibid.* Her husband was convicted of domestic battery and a probation violation. *Id.* at 820–21, 126 *S.Ct.* at 2272–73, 165 *L.Ed.*2d at 236.

For the purpose of deciding whether the hearsay statements to the police in *Davis* and *Hammon* were admitted in violation of the Confrontation Clause, the Supreme Court articulated a standard that distinguished between nontestimonial and testimonial statements. Nontestimonial statements are those "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822, 126 *S.Ct.* at 2273, 165 *L.Ed.*2d at 237. Testimonial statements are those made in "circumstances objectively indicat[ing] that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237.

Although the Court set forth that standard to deal with police interrogations, it emphatically noted that it did not intend to imply that "statements made in the absence of any interrogation are necessarily nontestimonial." *Id.* at 822 n. 1, 126 *S.Ct.* at 2274 n. 1, 165 *L.Ed.*2d at 237 n. 1. The Court added that the "Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." *Ibid.*

In *Davis,* the Supreme Court concluded that the statements made by the domestic violence victim to the 911 operator, identifying her husband as her assailant, were nontestimonial. *Id.* at 827–28, 126 *S.Ct.* at 2276–77, 165 *L.Ed.*2d at 240–41. The Court stressed that the defendant was in the process of beating his wife, the declarant, while she spoke with the 911 operator. *Ibid.* Thus, the declarant-victim was "speaking about events *as they were actually happening,* rather than describ[ing] past events." *Id.* at 827, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240 (quotation omitted) (alteration in original). Although the Court recognized that "one *might* call 911 to provide a narrative report of a crime absent any

imminent danger," the woman in *Davis* was "plainly [calling] for help against a bona fide physical threat." *Ibid.*[11] Viewed objectively, the "primary purpose" of the victim's statements was to resolve an ongoing emergency, not "to learn ... what had happened in the past." *Id.* at 827–28, 126 *S.Ct.* at 2276–77, 165 *L.Ed.*2d at 240.

Because the victim's 911 statements were not "testimony" in the Sixth Amendment sense—an account of a past event—but rather a cry for help "to enable police assistance to meet an ongoing emergency," *id.* at 828, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 240, the admission of those statements did not violate the Confrontation Clause. *Id.* at 828–29, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 240–41.

In *Hammon,* on the other hand, the Court held that the oral report and affidavit provided by the domestic abuse victim to the police who responded to her home were testimonial and barred by the Sixth Amendment. *Id.* at 829–32, 126 *S.Ct.* at 2278–80, 165 *L.Ed.*2d at 242–43. Unlike in *Davis,* in *Hammon* the police questioned the victim about "possibly criminal past conduct." *Id.* at 829, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. "[T]here was no immediate threat" to the victim in *Hammon*—"no emergency in progress"—because the police had separated the abusive husband from his wife. *Id.* at 829–30, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. Viewed objectively, "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime," to learn " 'what happened' " rather than " 'what [was] happening.' " *Id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242.

The Court in *Hammon* concluded that the interrogation satisfied the formality requirements for a testimonial statement, noting

---

[11] The Court noted, however, that nontestimonial statements elicited during an "interrogation to determine the need for emergency assistance" can, once the emergency has dissipated, "evolve into testimonial statements." *Davis, supra,* 547 *U.S.* at 828, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 241 (quotation omitted). Thus, the Court suggested in *Davis* that "after the operator gained the information needed to address the exigency of the moment" and the assailant had fled from the premises, the victim's remaining statements to the 911 operator were testimonial. *Ibid.*

that the woman was questioned "in a separate room, away from her husband." *Ibid.* On that same point, the Court maintained that the Confrontation Clause cannot be evaded simply "by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." *Id.* at 826, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 239. Indeed, a statement elicited during an "interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial." *Id.* at 826, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240.[12] Thus, in *Hammon*, the Court was satisfied that the declarant's statements were "inherently testimonial" because they were "an obvious substitute for live testimony." *Id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242.

### B.

We now apply the principles developed in *Crawford* and *Davis* to the facts before us. Nothing in the record suggests that the witness, who refused to come to court, was ever subpoenaed to appear at trial. Therefore, it is questionable whether the witness was truly unavailable for Confrontation Clause purposes. *See N.J.R.E.* 804(a)(2) (stating that witness is unavailable if he "persists in refusing to testify concerning the subject matter of the statement despite an order of the court to do so"). We need not decide that issue, however, because we find that defendant did not have a prior opportunity to cross-examine the non-appearing witness whose statements were clearly testimonial.

The witness to the robbery of Juana Chavez provided information to Officer Semmel approximately ten minutes after the completion of that crime. The declarant followed Chavez's assailants

---

[12] Significantly, the Court noted that "[t]he solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood." *Davis, supra,* 547 *U.S.* at 826, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240.

immediately after witnessing the robbery and cut short his pursuit at Public School 30. When he met with Officer Semmel several minutes later, he related information about a past event—the robbery and flight of the robbers. That the witness may have volunteered the information or responded to open-ended questions does not change the calculus of whether his statements were testimonial. *See Davis, supra,* 547 *U.S.* at 822 n. 1, 126 *S.Ct.* at 2274 n. 1, 165 *L.Ed.*2d at 237 n. 1.

Like in *Hammon,* the non-testifying witness here told the police officer "what [had] happened." *Id.* at 830, 126 *S.Ct.* at 2278, 165 *L.Ed.*2d at 242. There was no ongoing emergency—no immediate danger—implicating either the witness or the victim, both of whom were in the company of police officers at the time of the "interrogation" at Public School 30. We disagree with the State and Attorney General's argument that we should interpret "ongoing emergency," for Confrontation Clause purposes, in a way that would allow the use of testimonial hearsay narrating a past crime so long as the suspects are at large, even when neither the declarant nor victim is in danger. Such an expansive definition was implicitly rejected by the *Davis* Court. Indeed, in *Davis,* after the abusive husband fled his home, ending the immediate emergency, the Court declared that "[i]t could readily be maintained" that the wife's continuing remarks to the 911 operator were testimonial statements. *Id.* at 828–29, 126 *S.Ct.* at 2277, 165 *L.Ed.*2d at 241.[13]

Our reading of *Davis* leads us to conclude that a declarant's narrative to a law enforcement officer about a crime, which once completed has ended any "imminent danger" to the declarant or some other identifiable person, is testimonial. *See id.* at 827–28, 830, 126 *S.Ct.* at 2276–78, 165 *L.Ed.*2d at 240–42 (noting that victim in *Davis* was facing "a bona fide physical threat" while on

---

[13] Had the prosecution introduced the contemporaneous statements of the eyewitness to the 911 operator, assuming that he was relating the robbery in progress and pursuit, the Confrontation Clause analysis might well have been different.

911 call whereas victim in *Hammon* did not have "immediate threat to her person" while speaking with officer). A number of jurisdictions appear to be in accord with that interpretation. *See, e.g., People v. Cage*, 40 *Cal.*4th 965, 56 *Cal.Rptr.*3d 789, 155 *P.*3d 205, 217 (finding that assault victim's statements to officer were testimonial because assailant and victim were separated and victim "was in no danger of further violence as to which contemporaneous police intervention might be required"), *cert. denied,* — *U.S.* ——, 128 *S.Ct.* 612, 169 *L.Ed.*2d 395 (2007); *Commonwealth v. Galicia*, 447 *Mass.* 737, 857 *N.E.*2d 463, 466–67, 470 (2006) (finding that victim's statements to police describing assault that occurred less than five minutes earlier were testimonial because victim and defendant were separated from each other); *Zapata v. State*, 232 *S.W.*3d 254, 255–57, 260 (Tex.App.2007) (holding that victim's statements about recent assault to officer responding to call for emergency assistance were testimonial because she was separated from defendant and because "there is no evidence that there was an ongoing conflict").[14]

Additionally, the witness's statements to Officer Semmel in the parking lot of Public School 30 met the formality and solemnity requirements of *Crawford*. It is a crime to knowingly "give[ ] . . .

---

[14] The record in this case does not involve flight with a weapon that might present an ongoing emergency. Some courts have held that after a shooting or an offense involving a gun, the immediate threat of the armed suspect returning to the scene constitutes an ongoing emergency. *See United States v. Arnold*, 486 *F.*3d 177, 179–80, 189–92 (6th Cir.2007) (en banc) (finding that victim's statements to officers about an earlier threat to kill her were nontestimonial because defendant was armed and in vicinity), *cert. denied,* — *U.S.* ——, 128 *S.Ct.* 871, 169 *L.Ed.*2d 736 (2008); *State v. Ayer*, 154 *N.H.* 500, 917 *A.*2d 214, 219–20, 224–25 (N.H.2006) (finding nontestimonial witness's statements to officer at scene of shooting identifying defendant because "mere minutes had passed since the public shooting ... by an unknown, at-large assailant"), *cert. denied,* — *U.S.* ——, 128 *S.Ct.* 63, 169 *L.Ed.*2d 52 (2007); *People v. Nieves-Andino*, 9 *N.Y.*3d 12, 840 *N.Y.S.*2d 882, 872 *N.E.*2d 1188, 1188–91 (2007) (concluding that bleeding victim's statements providing name of defendant and details of shooting in response to officer's questioning were nontestimonial because "[g]iven the speed and sequence of events, the officer could not have been certain that the assailant posed no further danger to [victim] or to the onlookers").

false information to any law enforcement officer with the purpose to implicate another," *N.J.S.A.* 2C:28–4(a), and a disorderly persons offense to report an offense to a law enforcement officer "knowing that it did not occur," *N.J.S.A.* 2C:28–4(b). *See Davis, supra,* 547 *U.S.* at 826–27, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240 (noting that solemnity requirement satisfied by criminal penalties for making "a deliberate falsehood" to law enforcement). As *Davis* indicated, a policeman's recitation of unsworn hearsay from notes, rather than from a deposition, does not transform a testimonial statement into a nontestimonial one. *See id.* at 826, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 239–40 (stating that formality requirement satisfied by police officer reading from his notes).

Moreover, the non-testifying eyewitness in this case was "bearing witness" against J.A.[15] His out-of-court statements were the equivalent of in-court testimony, without being subject to cross-examination. The declarant's "testimony" was the critical piece of evidence against J.A. Chavez only saw one person, H.A., knock her down and grab her purse. Although she testified that a second person fled with H.A., she could only say that the second person was wearing a black jacket or pants. In contrast, the eyewitness stated that the second person who participated in the attack on Chavez was wearing a red jacket and glasses.

In the circumstances of this case, we have little difficulty concluding that the non-appearing eyewitness's statements were testimonial. When objectively viewed, the facts indicate that there was no "ongoing emergency" within the contemplation of *Davis,* and that "the primary purpose of [Semmel's] interrogation [was] to establish or prove past events potentially relevant to [a] later criminal prosecution." *Id.* at 822, 126 *S.Ct.* at 2273–74, 165 *L.Ed.*2d at 237.[16] Of course, in order to prosecute Chavez's

[15] Even the assistant prosecutor in summation characterized the absent eyewitness as having *"testified* that he saw the two individuals knock [Chavez] down and run with her purse." (Emphasis added).

[16] As noted earlier, it makes no difference whether Officer Semmel initiated the questioning or the witness volunteered the information. The statements are

assailant(s), they first had to be apprehended, and the eyewitness's statements served that purpose as well.

Accordingly, we hold that the admission of Officer Semmel's testimony relating the testimonial statements of the non-appearing eyewitness violated defendant's Sixth Amendment right to confront the witnesses against him. Without the non-testifying witness's account and description of J.A., it is unlikely that a successful prosecution could have been mounted against him. For that reason, we cannot say that the admission of the testimonial hearsay was harmless beyond a reasonable doubt. *See R.* 2:10–2; *Chapman v. California,* 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.*2d 705, 710–11 (1967); *State v. Macon,* 57 *N.J.* 325, 340, 273 *A.*2d 1 (1971).

It deserves mentioning that the Confrontation Clause only pertains to the use of *ex parte* testimonial statements at trial. As the United States Supreme Court reminds us in *Davis,* the Confrontation Clause in no way governs or impedes the manner in which law enforcement conducts investigations, gathers evidence, or arrests suspects at large. The Confrontation Clause only requires that a witness who bears testimony against the accused be present at trial and subject to cross-examination, and if the witness is unavailable, that the accused have been given the prior opportunity of cross-examination.

## V.

In summary, we conclude that the non-appearing eyewitness's statements to Officer Semmel about the robbery were testimonial. Because there was no proof of the eyewitness's unavailability and J.A. did not have the opportunity to cross-examine him, those statements were admitted in violation of his Sixth Amendment right to confront the witnesses against him. We therefore reverse

---

testimonial nonetheless. *See Davis, supra,* 547 *U.S.* at 822 n. 1, 126 *S.Ct.* at 2274 n. 1, 165 *L.Ed.*2d at 237 n. 1.

the judgment of the Appellate Division and defendant's adjudication of delinquency, and remand to the Family Part for a new trial consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

After *Crawford v. Washington*, 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004), trial courts in criminal cases are commanded to engage in a two-step process in deciding the admissibility of hearsay statements. As a necessary threshold inquiry, the court must determine whether the proffered statement is in fact hearsay, that is, whether it is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *N.J.R.E.* 801(c). If the proffered statement is not hearsay, it is admissible under *Evidence Rule* 402 provided it is relevant, *see N.J.R.E.* 401, and it is not otherwise subject to exclusion.[1] And, under *Crawford*, the admission of non-hearsay statements does not trigger constitutional concerns. *Crawford, supra*, 541 *U.S.* at 59 n. 9, 124 *S.Ct.* at 1369 n. 9, 158 *L.Ed.*2d at 197 n. 9 ("The [Confrontation] Clause also does not bar the use of testimonial statements for

---

[1] *See, e.g., N.J.R.E.* 403 (excluding relevant evidence "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence"); *N.J.R.E.* 404(a) (excluding as irrelevant specified forms of character evidence); *N.J.R.E.* 404(b) (excluding as irrelevant certain types of other-crimes evidence); *N.J.R.E.* 405 (defining methods of proving character); *N.J.R.E.* 406 (limiting, as irrelevant, admissibility of evidence of habit or routine); *N.J.R.E.* 407 (limiting, on public policy grounds, certain evidence of subsequent remedial measures); *N.J.R.E.* 408 (limiting, on public policy grounds, admissibility of "evidence of statements or conduct by parties or their attorneys in settlement negotiations"); *N.J.R.E.* 409 (limiting, on public policy grounds, admissibility of "[e]vidence of furnishing or offering or promising to pay medical, hospital, property damage, or similar expenses occasioned by an injury or other claim"); *N.J.R.E.* 410 (limiting, on public policy grounds, evidence of a guilty plea later withdrawn, "of any statement made in the course of that plea proceeding, and of any statement made during plea negotiations when either no guilty plea resulted or a guilty plea was later withdrawn"); *N.J.R.E.* 411 (limiting, on public policy grounds, evidence of liability insurance); *N.J.R.E.* 412 (adopting Rape Shield Law, *N.J.S.A.* 2C:14–7).

purposes other than establishing the truth of the matter asserted." (citing *Tennessee v. Street*, 471 *U.S.* 409, 414, 105 *S.Ct.* 2078, 2081– 82, 85 *L.Ed.*2d 425, 431 (1985))).

If, however, the trial court determines that the proffered statement is hearsay, it must then ascertain whether that hearsay statement is nevertheless admissible under the *Evidence Rules* before engaging in a *Crawford*/Confrontation Clause constitutional analysis. That is because "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.'" *Id.* at 61, 124 *S.Ct.* at 1370, 158 *L.Ed.*2d at 199.

That hierarchical analytical structure—one that requires that the non-constitutional issue be addressed first before any constitutional question is broached—is so firmly embedded in our jurisprudence that we often dispense with any citation to its authority. *See, e.g., State v. Branch*, 182 *N.J.* 338, 354, 865 *A.*2d 673 (2005) (resolving hearsay question as not an excited utterance and therefore not admissible, thus not addressing Confrontation Clause arguments reasoning that "[b]ecause we resolve the issue on independent state grounds, we do not need to decide the constitutional challenge"). More recently, we reiterated that "we do not address constitutional questions when a narrower, non-constitutional result is available[.]" *United States v. Scurry*, 193 *N.J.* 492, 500 n. 4, 940 *A.*2d 1164 (2008) (citing *Randolph Town Ctr., L.P. v. County of Morris*, 186 *N.J.* 78, 80, 891 *A.*2d 1202 (2006) (holding that "[c]ourts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation"); *O'Keefe v. Passaic Valley Water Comm'n*, 132 *N.J.* 234, 240, 624 *A.*2d 578 (1993) (same; citing cases)). *Accord N.J. Div. of Youth & Family Servs. v. S.S.*, 187 *N.J.* 556, 564, 902 *A.*2d 215 (2006); *Gac v. Gac*, 186 *N.J.* 535, 547, 897 *A.*2d 1018 (2006) (stating that "[r]ecently, we restated that a constitutional issue should not be decided unless its resolution is imperative to the disposition of litigation" (citation and internal quotation marks omitted)); *State v. Fowlkes*,

169 *N.J.* 387, 396, 778 *A.*2d 422 (2001) ("noting rule that 'a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation' " (quoting *Donadio v. Cunningham,* 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971)); *In re N.J. Am. Water Co.,* 169 *N.J.* 181, 197, 777 *A.*2d 46 (2001) (stating that "[w]e adhere to the principle that courts should not reach constitutional questions unless necessary to the disposition of the litigation" (citation and internal quotation marks omitted)).

Today, the majority abandons those bedrock principles in favor of expediency. Although the majority first addresses whether the hearsay statements are admissible, it inexplicably comes to no conclusion on that issue.[2] Instead, the majority eschews determining whether the challenged hearsay statements are admissible, concluding that "[a]lthough the witness's statements *might be admissible* as excited utterances, we have no doubt that the admission of those statements ran afoul of the Confrontation

---

[2] The trial court admitted the hearsay statements under the present sense impression exception codified in *Evidence Rule* 803(c)(1), and the Appellate Division found that the hearsay statements were also admissible as excited utterances pursuant to *Evidence Rule* 803(c)(2). Although the trial court "rejected, without elaboration, the excited utterance exception as a justification for the admission of the witness's out-of-court statements[,]" *ante* at 331 n. 2, 949 *A.*2d 793, and the majority rejects the admission of the hearsay statements as present sense impressions under *Evidence Rule* 803(c)(1), *ante* at 339–40, 949 *A.*2d 798–99, we nevertheless may reach the same conclusion as the trial court—that the hearsay statements were admissible—albeit as excited utterances and not as present sense impressions. As we have explained, "[i]t is a commonplace of appellate review that if the order of the lower tribunal is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance." *Isko v. Planning Bd. of Twp. of Livingston,* 51 *N.J.* 162, 175, 238 *A.*2d 457 (1968) (citations omitted). This is so because "[a]ppeals are taken from judgments or orders and not from reasons assigned therefor [and i]f the result below was right, there must be an affirmance even though an incorrect reason was given for the denial of the motion." *Janiec v. McCorkle,* 52 *N.J.Super.* 1, 21, 144 *A.*2d 561 (App.Div.1958) (citations omitted). *See also Glaser v. Downes,* 126 *N.J.Super.* 10, 16, 312 *A.*2d 654 (App.Div.1973) ("Of course, appeals are taken from judgments and not from opinions, let alone dicta.") (citing *Hughes v. Eisner,* 8 *N.J.* 228, 84 *A.*2d 626 (1951)).

Clause." *Ante* at 341, 949 *A*.2d 799 (emphasis supplied).[3]

That unstructured analysis constitutes a dangerous and head-long rush to reach a constitutional question when that question need not be addressed. If the majority is unwilling or unable to determine that the admission of the challenged hearsay statements was proper on any ground, then its obligation is clear: it should reverse on that basis and ignore the seductive call of the constitutional claim. On the other hand, if the majority believes that the hearsay statements in fact were admissible, then it should display the courage of its conviction and state that conclusion. Only then would it become necessary to address the constitutional question.

The majority does neither. By its indecision, it relegates its entire constitutional analysis to the chiaroscuro of dicta—some-

---

[3] According to the majority, "[t]he interests of justice and judicial economy command" that the majority jettison fundamental canons of constitutional adjudication and, instead, "decide the constitutional issue before us, which will conclusively dispose of this appeal." *Ante* at 341 n. 9, 949 *A*.2d 799–800. The fallacy in that argument is transparent. Recent case law makes clear that we decide constitutional issues when the underlying litigation has become moot only in those instances where the issue is capable of repetition but evading review. *Mistrick v. Div. of Med. Assistance & Health Servs.*, 154 *N.J.* 158, 712 *A*.2d 188 (1998) ("Although ordinarily we decline to decide moot appeals, we occasionally will rule on such matters where they are of substantial importance and are capable of repetition, yet evade review."); *Zirger v. General Accident Ins. Co.*, 144 *N.J.* 327, 330, 676 *A*.2d 1065 (1996) ("Ordinarily, our interest in preserving judicial resources dictates that we not attempt to resolve legal issues in the abstract. On occasion, however, we will decide such appeals where the underlying issue is one of substantial importance, likely to reoccur but capable of evading review." (citations omitted)). The majority nowhere attempts to justify its need to leapfrog over the threshold evidentiary issue to reach an otherwise unnecessary constitutional question, or to explain how the constitutional issues in this case somehow have evaded review by this Court. Furthermore, the majority's final reasoning—that it is proper to address the constitutional question because it "conclusively dispose[s] of th[e] appeal"—does nothing more than place the proverbial rabbit in the hat. If that be so, there never will be a reason for this Court to stay its hand, thereby allowing it to—nay, mandating that it—reach constitutional questions in every case. But for its inexplicable and unique application in this case, there is no doubt the majority would reject that ersatz doctrinal methodology outright.

thing that "is unnecessary to the decision in the case and therefore not precedential[,]" *Black's Law Dictionary* 1100 (7th ed.1999)— and it is beyond question that "*dicta* cannot be *res adjudicata* from the very definition of the terms." *J.J. Hockenjos Co. v. Lurie*, 12 *N.J. Misc.* 545, 548, 173 *A.* 913 (Sup.Ct.1934). Impliedly recognizing that fate, the majority attempts a different tack, adopting the pretense that, on retrial, the trial court somehow must confront the admissibility of these hearsay statements anew. Having claimed that illusion as its unstable foundation, the majority analyzes the hearsay statements under the Confrontation Clause. It then ultimately concludes that, even if admissible under state evidence law, the challenged hearsay statements are "testimonial" and, hence, cannot be admitted unless the "witness who bears testimony against the accused [is] present at trial and subject to cross-examination, and if the witness is unavailable, that the accused have been given the prior opportunity of cross-examination." *Ante* at 351, 949 *A.*2d 805.

There is no basis for the majority's claim of prescience. On retrial, the State may forego offering those hearsay statements as evidence; thus, the issue would become moot. Even if so offered, the trial court may determine that, based on the record before it, the hearsay statements do not qualify for admission under any exception to the hearsay rule, again making the issue moot. Other events, many unforeseeable, may occur. In any of those instances, there will be no need for anyone to even address whether the hearsay statements are "testimonial" and thus subject to *Crawford's* strictures.

If the majority had determined that the trial court did not abuse its discretion when it admitted the challenged hearsay statements, I would have embraced unreservedly the majority's reasoning on both the hearsay and Confrontation Clause questions. Conversely, if the majority had determined that the trial court abused its discretion when it admitted the challenged hearsay statements, the analysis should have ended at that point, thereby allowing for a principled disagreement on that subject. Instead, the majority

tenders a "neither-fish-nor-fowl" analysis that, in the end, does grave violence to the measured and self-limiting way this Court traditionally and properly has discharged its adjudicatory obligations. I cannot join in an opinion that jettisons those cherished, fundamental principles, regardless of how lofty the ultimate goal or how correct the superfluous analysis may be.

I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For affirmance*—Justice RIVERA-SOTO—1.